**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Justin Stern, Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and states under penalty of perjury that the following is true to the best of my information, knowledge and belief.

**I.   Background:  The Purpose of this Affidavit, the Initiation of the Investigation, and my Sources of Information**

1. I make this affidavit in support of an application of a criminal complaint alleging BRIAN CHRISTOPHER PAZ PALMER committed aggravated identity theft in violation of 18 U.S.C. § 1028A.

2. I have been a Special Agent with the FBI since December of 2004.  I am the primary Case Agent for this investigation.  As the primary Case Agent, I am familiar with the facts of the case.  As a part of my training, I received seventeen weeks of investigative training at the FBI Academy in Quantico, Virginia.  Since completing training, I have participated in numerous criminal investigations.  These investigations have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, utilization of informants, seizure and analysis of computer information and various other techniques.  I am currently assigned in Boulder, Colorado; a small satellite office of the FBI's Denver Division.  In this capacity, I am responsible for investigating all federal criminal violations under the FBI's purview.  During my career with the FBI, I have investigated organized crime, drugs, gangs, violent crime, firearms, financial crime and money laundering for the majority of my career.

3. Throughout this affidavit, I intentionally refer to witnesses and victims by their position, business type, role or other general description.  All of their identities are known to me.

4. On August 26, 2021, the FBI received an online tip, submitted via tips.fbi.gov, that BRIAN CHRISTOPHER PAZ PALMER had threatened to commit an act of violence at an area high school.  The same day, I interviewed SCHOOL EMPLOYEE 1 of BOULDER VALLEY SCHOOL DISTRICT HIGH SCHOOL, who relayed in sum and substance and in pertinent part that (1) PALMER was a former student of the school; (2) PALMER visited the school that morning and appeared to be emotionally escalated, nervous, and agitated; (3) PALMER made comments about going on a "hunting mission," wanting to establish his legacy within the next year, tying up loose ends, and he was upset there was no one there at the time to injure.

5. Upon further inquiry I learned of additional local law enforcement agencies' investigations into BRIAN CHRISTOPHER PAZ PALMER's possible criminal conduct.  Some of these investigations have been conducted by the following Colorado law enforcement agencies: Boulder Police Department; Boulder County Sheriff's Office; Broomfield Police Department; Westminster Police Department; Aurora Police Department; and Lafayette Police Department.  These investigations concern conduct that may also relate to federal criminal statutes including bank fraud, access device fraud, and identity theft, as well as other possible federal violations.

6. The facts set forth in this affidavit are based on my personal knowledge as the investigation's Case Agent; knowledge obtained from other individuals including law enforcement

1

personnel, my review of documents, reports and other evidence.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.  The information contained within this affidavit does not represent every fact learned by law enforcement during the course of the investigation.  Rather, I have only included information sufficient to establish probable cause for the requested criminal complaint.

## II.    BRIAN CHRISTOPHER PAZ PALMER's Interactions with IDENITTY THEFT VICTIM

7.    I have reviewed reports related to Lafayette Police Department case number 202102510.  According to those reports, IDENTITY THEFT VICTIM called 911 on July 19, 2021, after discovering her wallet and car keys were missing.  A Lafayette Police Department Officer responded to the call and met with IDENTITY THEFT VICTIM at approximately 3:30 a.m. in the parking lot of a bagel store in Lafayette, Colorado.  In sum and substance and in pertinent part, the officer reported that IDENTITY THEFT VICTIM made the following statements:

   a.    IDENTITY THEFT VICTIM said she lived in her car, a 2006 Silver Hyundai Sonata with the Colorado license plate "ITHOTSO."

   b.    Earlier in the evening IDENITY THEFT VICTIM had been contacted by a friend she had met through an online dating app, whom she knew as "Philip Manga."[1]  This friend, Philip Manga, asked to borrow IDENTITY THEFT VICTIM's car and IDENTITY THEFT VICTIM arranged for a ride share to transport Philip Manga.

   c.    IDENTITY THEFT VICTIM said that earlier in the evening she was laying in her car with "Philip."  Thereafter, "Philip" got out of the car, said he was leaving and would go where the wind takes him.  About thirty minutes later, IDENTITY THEFT VICTIM discovered her car keys and wallet were missing. The wallet contained IDENTITY THEFT VICTIM's debit card issued by VICTIM CREDIT UNION, driver's license, Social Security card, and $60 cash.

   d.    The Officer reported that IDENTITY THEFT VICTIM was "very deceitful." She would only provide one-word answers to questions, appeared to be embarrassed, and did not want to elaborate on what had happened that night.

8.    According to another report in Lafayette Police Department case number 202102510, IDENITTY THEFT VICTIM walked into the Lafayette Police Department on July 20, 2021, to report that "Philip" — the man she had identified the day before — had accessed her bank account. She accused "Philip" of paying $211 to an inmate within the Department of Corrections, and of making several other transactions on her account at various vending machines in Weld County.

9.    According to another, subsequent report in Lafayette Police Department case number 202102510, IDENTITY THEFT VICTIM stated she had "hooked up" with "Philip" in her car that night and that the wallet and keys were missing after she woke up.  She described "Philip" as a male

---

[1] I believe, based on my experience, that the name in the reports was likely rendered from a phonetic oral account.  I do not know how this alias is spelled.  In other reports, it is spelled "Magna" or "Managa." Because of this discrepancy, I refer to this alias as "Philip."

with long dark curly hair, possibly Filipino, with facial hair around his chin. Other information provided to me indicates that IDENTITY THEFT VICTIM has made conflicting statements about how she initially met and began a relationship with "Philip."

10. I have reviewed body camera footage of Aurora Police Department Officers' interactions with BRIAN CHRISTOPHER PAZ PALMER on August 28, 2021 in a hotel room PALMER was residing at in Aurora, Colorado. PALMER has long, dark hair that slightly curls at the end of its length. PALMER appears to have chin and beard hairs that are not thick in nature. As set forth in more detail below, PALMER told me during an interview on September 28, 2021 that he is half Filipino and, in his own words, "rolls Asian."

11. Reports in Lafayette Police Department case number 202102510 also indicate that on August 2, 2021, IDENTITY THEFT VICTIM identified BRIAN CHRISTOPHER PAZ PALMER as the "Philip" who took her wallet and keys on July 19, 2021. According to the report, an Officer at the Lafayette Police Department contacted IDENTITY THEFT VICTIM on August 2, 2021, and asked her to come to the police department to identify the person who took her wallet via presentation of a photographic lineup. The Officer read a disclaimer that the individual might not be in the lineup and then showed her six photographs. IDENTITY THEFT VICTIM had no reaction to the first four photographs. When she saw photo number five in the Officer's hand, she immediately indicated that it was "Philip." The Officer presented the sixth photo and then spread each of them on the table. IDENTITY THEFT VICTIM again pointed at photo number five — the photo of PALMER — and identified him as the "Philip" she was with on July 19, 2021. IDENTITY THEFT VICTIM remarked "I don't want to sound racist, but I could recognize him by his eyes." I relay this statement for the Court's consideration and awareness, because IDENTITY THEFT VICTIM appeared to make a generalization about the racial characteristics of others. However, in my experience, there is no way to identify someone or their race based on their eyes. I've included the statement here because it at least partially bears on IDENTITY THEFT VICTIM's reasons for making the identification.

### III. The Use of IDENTITY THEFT VICTIM'S Means of Identification to Obtain Funds from VICTIM CREDIT UNION

12. I have reviewed business records of VICTIM CREDIT UNION related to account number x4510, which refers to a savings account identified as Primary Savings ID 0001 and a checking account identified as Earn Big Free Checking ID 0005, held by IDENTITY THEFT VICTIM. In sum and substance and in pertinent part the records reveal the following:

    a. The records confirm that IDENTITY THEFT VICTIM had a debit card associated with her checking account at VICTIM CREDIT UNION. On July 19, 2021, someone used the associated debit card to withdraw $211.95 in a transaction labeled, in part, "Inmate Payment." Also on July 19, 2021, several debit card withdrawals were referenced as "Coca Cola" in Denver and Johnstown, Colorado. Another withdrawal in the amount of $59 was referenced as "CoPart," with an associated telephone number 707-639-5000.

    b. On September 28, 2021, I queried LexisNexis for information concerning businesses known as CoPart having telephone number 707-639-5000. The results identified a business in Fairfield, California with an associated website, www.copart.com. Thereafter, I visited

the company's website which described the business in its "How It Works" section as an online automobile and other vehicle auction, specifically: "Nearly 200,000 Cars, Trucks, SUVs, Motorcycles and More for Sale" and "Copart auctions have something for everyone – used car buyers, dismantlers, dealers, body shops, salvage buyers and individuals."

      c.    The records included IDENTITY THEFT VICTIM's submission of a form titled "Notification of Fraudulent Transaction" to VICTIM CREDIT UNION. The signed form was submitted on July 20, 2021, and identified approximately thirteen fraudulent transactions, totaling approximately $301.23, including the inmate payment and the "CoPart" payment, and the transactions related to coca cola purchases.

      d.    The records include a recorded telephone call to VICTIM CREDIT UNION on July 19, 2021. The recorded call reveals two different VICTIM CREDIT UNION employees interacted with someone who purported to be IDENTITY THEFT VICTIM.

      i.    At the beginning of the call, a credit union employee asks the caller, "who do I have the pleasure of speaking to?" The caller responds by voicing IDENTITY THEFT VICTIM's first name. I know IDENTITY THEFT VICTIM is female and BRIAN CHRISTOPHER PAZ PALMER is male. I know PALMER is male, in part, due to my aforementioned review of an Aurora Police Department Officer's body camera footage of an attempted interview of PALMER on August 28, 2021. During the interaction, PALMER removes his pants, exposing his penis and genitalia for an extended period. Although I have not personally interviewed either individual, the voice purporting to be IDENTITY THEFT VICTIM is deeper, and in my experience, more frequently attributed with male voices.

      ii.    When the credit union employee asked the person claiming to be IDENTITY THEFT VICTIM for the account number or member number, the individual responded: "That's the thing why I'm calling. I recently was resetting my, uh, laptop and it accidentally ended up wiping and wiped the file which had my, uh, card pin, my, uh, member number and password."

      iii.    Thereafter, the credit union employee asked for the caller's Social Security number. The caller responded by reciting the nine digits that comprise IDENTITY THEFT VICTIM's actual Social Security number. However, the caller transposed the number's second and third digits.

      iv.    As a result of the transposed Social Security number, the employee was not able to find the account. The caller expressed surprise, saying: "I have my card right here." The credit union employee then said he could look up the account by card number. At that point, the caller correctly provided the debit card number associated with IDENTITY THEFT VICTIM's account at VICTIM CREDIT UNION. I submit a debit card number is an "access device" as the term is defined at 18 U.S.C. § 1029(e)(1), which is in turn incorporated into the definition of "means of identification" set forth at 18 U.S.C. § 1028(d)(7)(D), which is then used in 18 U.S.C. § 1028A.

      v.    After looking up the account with the debit card number, the credit union employee asked the caller additional security questions; the first was the call-in password. The caller responded, "Uh... that's the thing. I don't remember. It was all on that text file." The

employee then asked for the caller's date of birth.  The caller then correctly provided IDENTITY THEFT VICTIM's date of birth.  I submit a date of birth is a "means of identification" for purposes of 18 U.S.C. § 1028A, as defined at 18 U.S.C § 1028(d)(7)(A).

        vi.      After this part of the call, the credit union employee reported a technical issue, placed the caller on hold before transferring the caller to another employee.

    e.    Another audio file obtained from VICTIM CREDIT UNION, also dated July 19, 2021, begins with the caller referring to be transferred over due to technical issues.

        i.      The second credit union employee said that in order to provide the caller with any information the credit union would need to authenticate the caller.  The employee asked for the caller's mother's maiden name.  The caller could not provide this information, responding: "Uh... That's the thing that was also in the text file that I accidentally got deleted."  The employee stated that this is something the caller should know.  The caller said he did not remember as a result of a "bad car wreck."

        ii.      Thereafter, the second credit union employee asked for the last four digits of IDENTITY THEFT VICTIM's driver's license number.  The caller responded correctly with the last four digits of IDENTITY THEFT VICTIM's Colorado driver's license.  I submit an official state or government-issued driver's license or identification number is also a "means of identification" as that term is defined in 18 U.S.C. § 1028(d)(7)(A) and used in 18 U.S.C. § 1028A.

        iii.      When the caller was again unable to provide the account's call-in password, the credit union employee asked if the caller could physically come into a branch; the caller said the caller was currently unable to do so.  Next, the caller asked the employee for the caller's [debit] card pin.  The employee did not provide the caller with the pin.  When the employee asked whether the caller used online banking, the caller responded affirmatively, but stated the caller had forgotten the caller's username.  The caller then requested the employee provide the caller with the username; the employee refused to do so.  Before concluding the call, the employee requested the caller physically visit one of the credit union's branches for identification.  Shortly thereafter, the call concluded with the caller acknowledging the security concerns the employee raised, thanking the employee and wishing the employee a nice day.

    13.    The website for VICTIM CREDIT UNION represents that it is insured by the National Credit Union Administration.  The website for the National Credit Union Administration, in turn, indicates "02/05/1975" as the "date insured."

    **IV.**    **The Recovery of IDENTITY THEFT VICTIM 1's Stolen Car from BRIAN CHRISTOPHER PAZ PALMER and the Recovery of Means of Identification from a Hotel Room Used by PALMER**

    14.    I have reviewed reports maintained in Lafayette Police Department case number 202102527.  Among other things, those reports indicate that a Lafayette Police Department Officer responded to a call on July 20, 2021, from an automotive shop in Lafayette, Colorado, reporting a trespasser.  There, Officers found IDENTITY THEFT VICTIM, who reported her car had been stolen from the parking lot of the bagel shop the night before.  Employees at the shop reported that

IDENTITY THEFT VICTIM had come to them on July 19, 2021, to have the car's battery removed to prevent it from being stolen, but that she was intoxicated, not coherent, and unable to mentally appraise her situation. The employees were unable to provide her service. IDENTITY THEFT VICTIM disputed the employees' account.

15.   I have also reviewed reports maintained as part of Broomfield Police Department in case number 2021-00041851. Those reports show BRIAN CHRISTOPHER PAZ PALMER was arrested on July 21, 2021, while driving IDENTITY THEFT VICTIM's car, a gray Hyundai Sonata, with different license plates than those assigned the vehicle. According to the report, an Officer was dispatched in response to a report that the vehicle was on fire. The Officer found the car just east of the U.S. Highway 36 and Highway 121 interchange, with visible flames coming from behind the front passenger tire. The Officer evacuated the vehicle's sole occupant, PALMER, from the driver's seat. The Officer was unable to extinguish the flames with a fire extinguisher; it was later extinguished by North Metro Fire Rescue, who arrived shortly thereafter. PALMER told the Officers that the car was registered to his aunt but couldn't provide his aunt's name. The responding Officers determined that the Lafayette Police Department had reported the car stolen. Thereafter, the Officers arrested PALMER for Motor Vehicle Theft – First Degree, and Display/Possession of Altered/Fictitious Tab/Title/Sticker/ Plate. Officers' search of PALMER's backpack found a long knife and Nalgene bottle containing an unidentified brown liquid.

16.   After Officers arrested PALMER , an Officer contacted IDENTITY THEFT VICTIM who identified the person she suspected of stealing her car as: "Philip," male with shoulder-length brown hair, brown facial hair, and exhibiting "odd" behavior. The Officer who spoke to IDENTITY THEFT VICTIM advised her that the individual she described as "Philip" matched PALMER.

17.   I have also reviewed reports maintained as part of Lafayette Police Department case number 202103201. The reports describe the following:

   a.   BRIAN CHRISTOPHER PAZ PALMER's mother (hereinafter "MOTHER"), came to the Lafayette Police Department on September 13, 2021.

   b.   MOTHER reported that PALMER had recently been arrested and as a result, she cleaned out the hotel room. While cleaning the room she found items, which she placed in a plastic bag. MOTHER presented the plastic bag to the Lafayette Police Department.

   c.   Among other things, the bag of items provided to the Lafayette Police Department by MOTHER from PALMER's hotel room included numerous wallets, credit and debit cards, vehicle registration, car keys, garage door openers, cash (United States currency), cellular telephones, and a Colorado license plate, which was later associated with a car reported stolen.

   d.   I submit that there is probable cause to believe that one of the wallets belonged to IDENTITY THEFT VICTIM because her Social Security card and debit card associated with her account at VICTIM CREDIT UNION were recovered from one of the wallets. At present, investigators have not yet shown the wallet to IDENTITY THEFT VICTIM for confirmation IDENTITY THEFT VICTIM's driver's license was not amongst the items MOTHER provided the Lafayette Police Department. .

      18.     MOTHER's visit to the Lafayette Police Department was captured by the responding officer's body-worn camera. I have reviewed that camera footage. The footage indicates that MOTHER was initially reluctant to describe how she came into possession of the items in the plastic bag. She said [the matter] implicates a "loved one" who has since been "picked up" and that she had been "cleaning up the hotel room where he was staying." She further explained "I found those things. I don't believe they are his." MOTHER, who was distraught, said the hotel was "down in Aurora." "I just cleaned up the room and came home," she told the Officer.

      19.     I interviewed MOTHER on September 20, 2021. MOTHER confirmed she found, among other things, approximately eight wallets with others' identification, including the identification of an unknown female, an identification for a principal at a Boulder Valley School District school, garage door openers, a laptop computer, and approximately five to seven cellular phones. MOTHER also found multiple pocketknives, an axe, four milk jugs with their openings taped shut, and a gasoline can.

      20.     I interviewed BRIAN CHRISTOPHER PAZ PALMER at the Adams County Detention Facility on September 28, 2021. After advising him of his *Miranda* rights and witnessing his signature to a signed waiver of those rights. Among other things, he confirmed that he was the "primary" but not always sole occupant of the hotel room at the Woodspring Suites in Aurora. I asked him about transactions on IDENTITY THEFT VICTIM's debit card indicating purchases of several Coca Cola bottles and asked why Palmer did it. I then stated "You were thirsty? I'm making a bad joke." He responded "that's not a bad joke. That's, uh, in a way, the truth. Actually, no not in a way. It is." He also described himself as a "mixed breed. I'm half white and half Philippines, but I roll Asian."

      **V.**     **Summary of Basis for Probable Cause Belief that BRIAN CHRISTOPHER PAZ PALMER Committed Aggravated Identity Theft**

      21.     I submit there is probable cause to believe that BRIAN CHRISTOPHER PAZ PALMER is the person who executed a scheme and artifice to defraud, and attempt to defraud, VICTIM CREDIT UNION by obtaining money under its custody, by means of the false and fraudulent pretense that he was IDENTITY THEFT VICTIM, and in relation to that conduct — a bank fraud in violation of 18 U.S.C. § 1344 — he knowingly possessed and used without lawful authority means of identification for IDENTITY THEFT VICTIM, including her name, date of birth, driver's license, a partial Social Security number, and an "access device" in the form of IDENTITY THEFT VICTIM's debit card:

      a.     As set forth above, IDENTITY THEFT VICTIM identified PALMER as the man named "Philip" who took her wallet and car keys in the early morning hours of July 19, 2021. She stated that the wallet included her driver's license, Social Security card, and a debit card for an account held at VICTIM CREDIT UNION.

      b.     A wallet containing IDENTITY THEFT VICTIM's Social Security card, and debit card, was found by MOTHER in a hotel room that the Aurora Police Department found occupied by PALMER on August 28, 2021.

    c. PALMER was arrested while driving IDENTITY THEFT VICTIM's car whose keys were stolen from her on July 19, 2021.

    d. Based on the above evidence of the timing and circumstances, I submit there is probable cause to believe that PALMER had possession of IDENTITY THEFT VICTIM's Social Security card, driver's license and debit card on July 19, 2021, during the calls to VICTIM CREDIT UNION.  I also submit, based on the timing and circumstances, that there is probable cause to believe PALMER was the person on the line pretending to be IDENTITY THEFT VICTIM and using her means of identification.

  I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

              Respectfully Submitted,

              s/ Justin Stern_____
              Justin Stern
              Special Agent
              Federal Bureau of Investigation

Sworn to before me this 29th day of September 2021.

_____
Hon. Scott T. Varholak
United States Magistrate Judge

**Reviewed and submitted by Bryan David Fields, Assistant United States Attorney.**