IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.   21-mj-0168

UNITED STATES OF AMERICA,

     Plaintiff,

v.

BRIAN CHRISTOPHER PAZ PALMER

     Defendant.

## GOVERNMENT'S MOTION FOR ORDER OF DETENTION PURSUANT TO 18 U.S.C. §3142(f)

     The defendant is charged with aggravated identity theft for taking personal identifiers from a homeless victim and then using them to steal her identity as part of an attempted bank fraud. This instance of anti-social disregard for another is but one of many, some of which are even more disturbing. Just a few weeks after the identity theft, the defendant made an impromptu visit to his old high school. The headmaster there found the defendant in what appeared to be an agitated state. The defendant said that he was making deals, that he was on a "hunting mission," that he needed to tie up loose ends, that he wanted to establish his legacy within the next year, that he was excited about his recent purchase of a vintage trench coat, and that he was upset because he had no one to injure now that he was outside of jail. When the defendant's mom cleaned out the defendant's hotel room a few

1

weeks after that, she found an identification card for an elementary school principal and a "master key" that could be used to access a school. That same hotel room contained several knives, an axe, a gas can and several milk jugs that appeared to be modified with duct tape.

The defendant has no permanent residence and a history of capricious violence. Confronted now with the real possibility that he will not be able to establish a "legacy" within the next year, he is both a danger to the community and a flight risk. For all of the reasons set forth below, he should be detained pending trial in this matter pursuant to 18 U.S.C. § 3142(f).

### 1. Proffer of Facts Related to the Defendant's Crime, Violent History, and Personal Circumstances

#### A. The Government May Proceed by Proffer

The rules of evidence do not apply at a detention hearing and the Court has the discretion to proceed by way of proffer. 18 U.S.C. § 3142(f) (noting that proceedings may be by proffer); *see United States v. LaFontaine*, 210 F.3d 125, 130-131 (2d Cir. 2000) (finding no error in district judge's decision to accept proffer of defendant's danger to community and threatening behavior towards witnesses); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) ("We hold that the government as well as the defense may proceed by proffering evidence subject to the discretion of the judicial officer presiding at the detention hearing."); *United States v. Delker*, 757 F.2d 1390, 1395-96 (3d Cir. 1985) (exploring legislative history of Bail

Reform Act and concluding that district courts have discretion to conduct detention hearing by proffer).

The government proffers the relevant facts below, incorporating by reference the facts set forth in the affidavit supporting the complaint docketed at ECF No.1-2.

### B.    The Defendant's Identity Theft

As set forth in the affidavit supporting the complaint, ECF No. 1-2, the defendant met with the person who would become his victim during the evening between July 18 and 19, 2021. After spending some social time together, the defendant violated his companion's trust and then stole her wallet and the keys to her car, which at that time was also her only source of shelter. Confronted with his crime via text, his reaction was to taunt her. Despite her efforts to prevent him from stealing the car, the defendant eventually came back for it. On July 21, officers rescued the defendant from the driver's seat of that victim's car after people reported seeing it on fire. In between, the defendant took a substantial percentage of the victim's meager savings by, among other things, transferring $200 to a friend in jail and buying a used car part.

The defendant used deceit and subterfuge to conceal his endeavors. He represented himself to the identity theft victim as "Philip." When the victim's credit union locked down her account, he took the brazen step of appropriating his victim's identity. On recorded telephone calls he used her name, date of birth, driver's license and debit card account number to try to obtain access. He also tried to use

her social security number but accidentally transposed two of the digits.

      C.    <u>The Defendant's Prior Acts of Violence</u>

The defendant has a history of capricious violence. In August 2020 — just a few weeks before he turned 18 — the Westminster Police Department were dispatched in response to a reported assault. At the scene, the police found a 13-year old boy in the back of an ambulance with his head wrapped in a bandage. The boy reported that he was doing nothing more than walking down the street when he was attacked by the defendant. The defendant walked up to the boy and hit him in the head with a silver object. The defendant's girlfriend later gave additional context. After an argument in her apartment the defendant stormed out and was putting items into his car when he saw the victim and attacked him with a screwdriver. The evidence strongly suggests that the defendant viciously assaulted a 13-year old simply because that was the first person he saw on whom he could vent his anger. That victim suffered two facial lacerations covering his face in blood and a broken nose. One of those lacerations took eight stiches to close. The doctor said that some of those injuries would result in permanent disfiguration.

This random act of violence was not isolated. Just a few months prior, in May 2020, the defendant tried to strangle his father to death. He told the police that he enjoyed the feeling of strangling his father and was staring into his father's eyes while it happened. Later in the interview, he reported that he wanted to see the life leave the eyes of an animal and that he had homicidal ideations.

### D. The Defendant's Threats Against a School

The defendant is an adult — 19 years old — but is only recently removed from a tumultuous high school experience in which he disturbed his classmates by drawing swastikas on a white board and sharing memes about school shootings and sexual violence. He was removed from one high school in approximately 2018 after reportedly lunging at a teacher. After being kicked out, he came back in December 2019, getting through the locked doors by taking advantage of a staff member's mistake. The dean of students recognized the defendant and confronted him. He refused to leave until the police were called. His behavior was disturbing. At one point he mumbled in German; at another he just stood quietly without saying anything.

Despite the admonition to stay away from his former high school, the defendant showed up again on the morning of August 26, 2021. Again, he was confronted by the dean of students, who was joined by the headmaster. This time, he inquired about another student. Then he began talking about hunting missions, tying up loose ends, establishing a legacy within the next year, being upset that there was no one to injure, and being excited about the purchase of a new trench coat. Despite being given several opportunities to clarify that his comments were non-threatening, the defendant refused to offer such consolation. These disturbing comments in August 2021 occurred against the backdrop of a prior mass shooting in Boulder at a King Soopers in March, 2021.

The school administrators took the defendant's comments as a serious threat and reported it to the FBI, who contacted local law enforcement. An Aurora Crisis Response Team[1] located the defendant living at a hotel in Aurora and attempted to contact him on August 26 to check on his mental health and welfare. They failed but were able to find him the next day. After letting the team inside his room, the defendant's behavior became increasingly agitated and aggressive. He denied making the threats, but also mumbled something about being called a "terrorist." Eventually, he took off all of his clothes and began speaking in German. Inside the room, the officers saw two knives on his bedside table. They also saw three one-gallon milk jugs with gray duct tape on the top.

The officers left the room, unable to complete a full mental health evaluation. On or about September 2, the defendant was arrested for violating his probation. On September 13, 2021 the defendant's mother came to the Lafayette Police Department to provide items that she had found in the hotel room. Among those items was an identification card for an elementary school principal and a "master key" that could be used to access that school. Later, the mother reported that the room also contained an axe and a gasoline can.

---

[1] The Crisis Response Team is a collaborative effort between the Aurora Police Department and the Aurora Mental Health Center.   Its mission is to provide trauma-informed, compassionate care to individuals who might be experiencing a mental health crisis. The teams comprise trained police officers and clinicians equipped to respond appropriately to individuals who many have mental health problems.

### 2.  Legal Standard — the Bail Reform Act

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes the defendant's detention pending trial. The law presumes that some categories of defendants — such as those charged with crimes involving guns, violence, and drugs — should be detained. 18 U.S.C. § 3142(f)(1). *United States v. Muhtorov*, 702 F. App'x 694, 698 (10th Cir. 2017).

A finding of risk of flight must be supported by a preponderance of the evidence and a finding of danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

The Bail Reform directs that four factors be considered in the detention analysis: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including, among other things, the person's family ties, financial resources, length of residence in the community, and whether the defendant was under supervision when he committed the alleged offense; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

### 3.  The Defendant is a Danger to the Community and a Flight Risk

For the reasons stated below, the first three factors to be considered by courts in ordering pretrial detention weigh heavily in favor of detention in this case.

A.  <u>The Charged Crime of Identity Theft Inherently Conveys the Capacity to Deceive and Carries With it a Mandatory Minimum.</u>

The defendant is a skilled manipulator comfortable with stealing another's identity to manufacture money for himself. As set forth in the complaint, he knows the value of personal identifying information and how he can use it to further his interests. The charge carries with it a two year mandatory minimum sentence — among the most serious consequences the defendant has ever faced. In combination, the charge itself and the surrounding circumstances weigh in favor of the conclusion that the defendant has a motive to avoid consequences and the means — adopting another's identity and generating cash to travel — to do so.

B. <u>The Weight of the Evidence is Heavy, Further Increasing the Incentive to Flee</u>

The evidence detailed in the complaint demonstrates the heavy weight of the evidence here. The defendant's crime left behind a clear paper trail and several eyewitnesses:

- The identity theft victim is expected to testify that she met with the defendant the evening between July 18 and July 19 and that he took her wallet and key during that meeting. The wallet— with the victim's debit card — and key were later recovered from the defendant's hotel room by his mother. The defendant was also arrested while driving the identity theft victim's car, which somehow caught fire under his possession.

- The identity theft victim's credit union recorded a call in which the defendant used the identity theft victim's name, date of birth, debit card number and parts of her driver license number to fraudulently access the account. The defendant listed the phone number used to make that call as his telephone number when he visited a friend in jail that same day.

- The defendant used the identity theft victim's bank account to send $200 to a friend in jail. He visited that friend in jail and admitted that the friend would be getting money, falsely telling his friend that it was money

      owed to him.

- When interviewed by the FBI, the defendant denied visiting his friend in jail or sending him $200. But he did admit to using the identity theft victim's debit card to purchase several bottles of Coca-Cola, responding to the challenge "you were thirty? I'm making a bad joke" with "that's not a bad joke. That's, uh, in a way, the truth. Actually, no not in a way. It is."

C. <u>No Aspect of the Defendant's Character, Family Ties, Employment, Past Financial Conduct or Other History Diminishes the Risk of Flight or Danger All Weigh in Favor of Detention</u>

The defendant has been in state custody since approximately September 2, 2020. Before his arrest on the state probation violation, his personal circumstances were tenuous. He was living in a hotel room paid for by his mother. He had a job working at a big retailer, but all ties to his community were frayed. As set forth above, in May 2020 he strangled his father and told responding police that he had homicidal ideations. In August 2020 he got into an argument with his girlfriend and then violently assaulted the first passerby. There is no evidence that the defendant has the kind of relationships that would hold moral suasion over him if he chose to flee or otherwise take out his anger on others.

The evidence also suggests that the defendant may have been planning an act of violence at a school this past August, just before he was taken into state custody:

- The defendant had a history of disturbing and threatening conduct at his schools. One teacher told the police he feared that the defendant would come to the high school and shoot it up. He relayed that the defendant posted disturbing images of graphic pornography and pictures of killed people. Others at that school reported the defendant was kicked out as a

9

result of his behavior, including at one point lunging at a teacher. After being kicked out, he came back anyways in December 2019, left only when it became clear the police would be arriving, and was warned by the police not to go to the school.

- As set forth above, the defendant showed up at his former high school this past August despite the prior police warning. This time, he showed up again, asking the receptionist for a school roster. When the Dean of Students recognized him, she asked if he was ok.   He responded by saying he was going on hunting missions.   Asked for clarification, he said he was not hunting animals and that he was not thinking of conventional hunting.   He told her he was making deals and tying up loose ends, saying that he wanted to fulfill his legacy before turning 20 (which he seemed to think was going to happen in a few weeks, though he would only be 19). Asked about what kind of legacy, he said it was going to a positive one to him but was unsure if the rest of society would think his plans were good.   Then he laughed.   Asked whether he had a job, the defendant said it was boring because there was no one there he could hurt or injure.   Then he said "you can't see it, but I'm smiling under my mask."

- The defendant's mother cleared out his hotel room after his arrest and brough items to the Lafayette Police Department. Among those items was an identification card for an elementary school principal and a "master key" that could be used to access the school. The mother also saw modified jugs in the room and a gasoline can. She also found multiple phones, several forms of identification for other people, pocket knives, an axe, and garage door openers.   Prior to that, Aurora Crisis Response Team officers had seen modified milk jugs in his room.

- The defendant's responses to questions about the threat to the school from both the Crisis Response Team and the investigating FBI agent were either evasive, non-responsive, or cryptic.   For example, when asked about the "hunting missions" he told the FBI agent that it was a "nice little metaphor" he used to keep himself focused. But he would not answer questions about what his last hunting mission was and did not alleviate any concerns about what such a mission might entail.

Taken together, the available evidence paints a portrait of a profoundly disturbed young man prone to unpredictable paroxysms of violence putting school administrators in imminent fear of an attack who was later found to possess the

means of carrying out such an attack. His other crimes — numerous stolen cars and means of identification — simply show his intelligence, capacity for deceit, and disregard for others.

### D. Summary of The Many Factors Supporting Detention

All of the factors the court must consider under § 3142 support detention in this case.

- The nature and circumstances of the crime favor detention. This is a serious crime with a mandatory minimum sentence carried out with careful planning against a vulnerable victim in circumstances suggesting no remorse or hesitation. The prospect of serving the longest sentence he has ever known is greatly compounded by the considerable strength of the evidence.

- The defendant was under supervision while he committed the offense, which also favors detention.

- The defendant has no permanent residence, frayed ties to family, and no others with whom he is known to have a meaningful connection. This, combined the motive to flee outline above, also weighs in favor of the conclusion that he is a flight risk.

- The defendant's prior acts of violence and threats at his former school, combined with evidence that he was gathering a means of carrying out those threats and his stated intention to establish a "legacy" make him a danger to the community.

## 4. CONCLUSION

The evidence in this case will show beyond a reasonable doubt that the defendant stole the identity of a homeless victim, taunted her, and then took a substantial portion of her savings.   This crime is a serious one with serious consequences.   Furthermore, the defendant's commission of the crime took place

against a background suggesting that he is hostile to his community, dangerous to it, and would face no hesitation in either fleeing from it or attacking it.   He should be detained.

<div style="margin-left: 3em;">

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:      */s Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

</div>

## **CERTIFICATE OF SERVICE**

       I hereby certify that on December 2, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

                                      *s/ Bryan David Fields*
                                      United States Attorney's Office